**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| WILTON L. TRIGGS II, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LENNAR CORPORATION, STUART A. MILLER, and DIANE J. BESSETTE<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Wilton L. Triggs II ("Plaintiff") alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, among other things, an investigation conducted by and through his attorneys, which included, among other things, review and analysis of: (a) regulatory filings made by Lennar Corporation ("Lennar" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued and disseminated by Lennar; (c) analyst and media reports regarding the Company; and (d) information readily obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE CASE

1. This is a securities class action on behalf of all purchasers of Lennar common stock during the period between February 7, 2025, and October 2, 2026, both dates inclusive (the "Class Period"), who were injured thereby (the "Class"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, promulgated thereunder, 17 C.F.R. § 240.10b-5.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over the claims asserted in this complaint pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Lennar is headquartered in Miami, Florida, and certain acts and conduct complained of herein, including the dissemination to the investing public of materially false and misleading information, occurred in this District.

4. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. THE PARTIES

### A. PLAINTIFF

5. Plaintiff Wilton L. Triggs II purchased Lennar common stock at artificially inflated prices during the Class Period, as set forth in the certification attached hereto as Exhibit A and incorporated by reference, and suffered damages as a result of the conduct alleged herein.

### B. DEFENDANTS

6. Defendant Lennar is a Delaware corporation headquartered in Miami, Florida. Lennar operates as a home building company that constructs and sells single-family attached and detached homes. Lennar common stock trades on the New York Stock Exchange under the ticker symbol "LEN." As of August 31, 2026, the Company had nearly 208 million Class A shares issued and outstanding.

7. Defendant Stuart A. Miller ("Miller") was, at all relevant times, Lennar's Chief Executive Officer ("CEO"), and the Chairman of its Board of Directors ("Board").

8. Defendant Diane J. Bessette was, at all relevant times, Lennar's Chief Financial Officer ("CFO").

9. Defendants Miller and Bessette are collectively referred to as the "Individual Defendants." The Individual Defendants, together with Lennar, are collectively referred to as "Defendants."

10. The Individual Defendants made, or caused to be made, false statements that artificially inflated the prices of Lennar common stock during the Class Period. The Individual Defendants, because of their positions with the Company, possessed the power and authority to

control the contents of Lennar's press releases, interim financial reports, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pled herein.

11. Defendants are liable for: (i) making false statements; or (ii) failing to disclose non-public facts known to them about Lennar and the true market value of its common stock. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Lennar common stock was a success, as it: (i) deceived the investing public regarding Lennar's prospects and business; (ii) artificially inflated the market price of Lennar common stock; and (iii) caused Plaintiff and other members of the Class to purchase Lennar common stock at artificially inflated prices and suffer damages as the true facts regarding Lennar were revealed.

## IV. BACKGROUND OF LENNAR AND THE MILLROSE SPIN-OFF

### A. BACKGROUND OF LENNAR AND ITS LAND-LIGHT STRATEGY

12. Lennar is one of the nation's leading homebuilders. Since 2013, Lennar has been shifting its focus from on-balance sheet ownership and associated debt to land option platforms and option agreements. Lennar described this change as a shift to an "asset-light, land-light" strategy focused on building homes rather than holding land. As part of this ongoing strategy, Lennar increased its use of off-balance sheet vehicles to acquire homesites.

13. This strategic shift allowed Lennar to successfully reduce its supply of directly owned homesites and significantly increase the percentage of "controlled" homesites, which are directly owned by external land banks, from 19% as of the end of 2013 to 82% as of the end of 2024. "Controlled" homesites include lots with all required site improvements, such as legal approvals and utilities hookups. These assets remain separate and apart from Lennar's balance sheet until Lennar is ready to immediately begin construction.

14. Against this backdrop, Lennar's stock price performed exceptionally well from early 2020 through late 2024, climbing from around $30 per share to over $185 per share. However, just prior to the start of the Class Period in February 2025, Lennar's stock price began to decline in the face of rising interest rates. By the beginning of February 2025, its stock price had dropped from over $185 per share to under $130 per share. In order to continue this major transition to a land-light strategy and further lessen the burden on its own balance sheet, Lennar decided to spin off a major subsidiary that it purported it would use only as a land bank.

### B. MILLROSE IS SPUN OFF FROM LENNAR CREATING A SEPARATE PUBLICLY TRADED COMPANY

15. On February 7, 2025, Lennar and Millrose Properties, Inc. ("Millrose") jointly announced that they had successfully completed a previously announced taxable spin-off of Millrose from Lennar. The spin-off was executed through a distribution of approximately 80% of Millrose's stock to Lennar's stockholders.

16. Millrose began trading that day as an independent company on the NYSE under the ticker symbol "MRP." Millrose's initial SEC filings described its business and purpose as engaging in land purchases, horizontal development and homesite option purchase arrangements for Lennar and potentially other homebuilders and developers. In connection with the spin-off, Lennar contributed $5.5 billion in land assets and $1 billion in cash to Millrose. In addition, the spin-off

was purportedly executed to accelerate Lennar's longstanding strategy of becoming a pure-play, asset-light (i.e., not purchasing undeveloped land until just before construction on new homes is to start), new home manufacturing company.

17. At the time of the announcement, Lennar highlighted several key benefits of the Millrose spin-off, including, most importantly, creating its own land bank that would acquire undeveloped land and create finished homesites, and holding them until Lennar was ready to begin construction. This externalization of land acquisition and pre-construction improvements would save Lennar the cost of doing this work itself or of paying a private land bank higher rates than Millrose to do the same. Therefore, post-spin-off, Lennar would accelerate its longstanding objective of focusing exclusively on "just-in-time," asset-light home production.

18. As to its financial prospects, Lennar stated that this strategy would significantly improve its cash flow conversion—because less money would be tied up in land sitting idle—and thus generate more profit per dollar invested by shareholders.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

19. Throughout the Class Period, Lennar touted (i) a simplified operating strategy that the Company claimed would effectively counter challenging market forces, and (ii) the Millrose spin-off as a successful strategic action that was solely used to accelerate its asset- and land-light positioning. Both categories of statements were false. First, Lennar employed an undisclosed scheme whereby expenses associated with Lennar's option agreements with land banks were capitalized—rather than listed as expenses on the balance sheet—in order to give a misleadingly favorable short-term impression of demand and financial performance. Second, Lennar hid the fact that Millrose had abandoned its stated mission as a land bank and was in fact purchasing Lennar homes at above market rates, and renting them at below market rates, to further inflate the Company's earnings and cover up

declining demand for its homes. Both sets of misstatements and omissions gave a false and misleading picture of Lennar's business and financial prospects.

20. The Class Period begins on February 7, 2025, when Lennar announced the completion of the spin-off of Millrose. Lennar touted that the spin-off enabled the Company to accelerate its asset-light model and that Millrose would serve as an independent land bank.

21. Six weeks later, on March 20, 2025, Lennar announced fiscal first quarter 2025 financial results. In the corresponding press release, the Company stated that its "average sales price, net of incentives, declined to $408,000, 1% lower than last year." Additionally, Lennar disclosed that its gross margin was 18.7%, just shy of its guidance, and its SG&A expenses were 8.5%, producing a 10.2% net margin, all contributing to earnings of $520 million, or $1.96 per diluted share.

22. Despite what were apparently lackluster results, Lennar assured investors that demand for its homes remained healthy, stating that the "first quarter was marked by a challenging macroeconomic environment for homebuilding. While ***demand remains strong***, persistently higher interest rates and inflation, combined with a downturn in consumer confidence and a limited supply of affordable homes, made it increasingly difficult for consumers to access homeownership." The Company further noted that it "***continued to use incentives, including interest rate buydowns, to reconcile home prices to market conditions***."

23. Lennar held a conference call to discuss these results the next day. During the call, CEO Miller stated that "[o]ur strategy is and has remained very clear. ***That is, simplify our business by focusing on the two core tenets of our operating strategy. Operationally, build and deliver consistent volume to maximize efficiencies and financially drive asset-light land-light focus to build cash flow***." In regard to the Millrose spin-off, and how it would help the Company

achieve its "two core tenets," Miller stated, "Now that we have completed our Millrose spin-off, we have intensified our focus on each. ***First we focus on consistent volume by matching our production pace with our sales pace.***" Later in the call, Miller stated that "the second focus of our operating strategy is to refine our asset-light configuration. ***We are much closer to the completion of the strategic rework of our operating platform from being a traditional homebuilder with sizable land assets to becoming a pure-play land-light asset-light manufacturing model homebuilder that benefits from just-in-time delivered – just-in-time finished home site delivery. The Millrose spin completed the backbone structure of that rework***. Now we are and have the time to focus on the refinement of that platform. With Millrose operational, we now have a strong complement of land-bank partners that enable the land and land development activity that enables the just-in-time delivery of fully developed homesite stocks as a manufacturer."

24. On June 16, 2025, Lennar announced earnings for the fiscal second quarter of 2025. The Company disclosed another decline in its average sale price to $389,000—down again slightly from the $408,000 announced in the prior quarter. Defendants continued to blame overall market conditions, stating that the reduced average sale price number "***[r]eflect[ed] softer market conditions . . . . [a]s mortgage interest rates remained higher and consumer confidence continued to weaken*** . . . ."

25. Lennar held a conference call to discuss the results the next day. During this call, Miller again reassured investors regarding the Company's ability to withstand negative market forces, stating, "as I noted last quarter, ***the Millrose spin was critical part of our asset-light, land light strategy***," and that "***we are continuing to drive certainty with volume for land bank partners, and this will help ensure stability and dependability.***"

26. On September 18, 2025, Lennar announced 2025 fiscal third quarter financial results, including another reduction in the average sales price of the Company's homes to $383,000, as well as a decline in its widely followed gross margin metric. Miller stated that the Company's "third quarter results reflect both the continued pressures of today's housing market and the consistency of Lennar's operating strategy." Miller continued, "While our current results reflect incentives and price adjustments to match market conditions, ***our scale and technology investments are building the foundation for structural cost efficiencies. Backed by a strong balance sheet and disciplined execution, we remain confident in our ability to build margin as conditions stabilize and to create sustained value***."

27. Lennar held a conference call to discuss the results the next day. On that call, when asked by an analyst about the Company's strategic efforts, Defendant Bessette stated that "there's no change in our strategy from quarter to quarter . . . and this was an unusual year with Millrose. But ***the trajectory is to really keep focus on cash generation***." When an analyst later asked about gross margins, Bessette stated, "***with the low cost that Millrose offers us, the more that we have deliveries from that vehicle. It's benefiting our margins***."

28. Defendants' statements in ¶¶ 20–27 were materially misleading when made because they misrepresented the true performance of the Company, including its relationship with Millrose. ***First***, statements discussing market conditions and touting the success of the asset-light strategy were misleading because they omitted that Lennar was secretly capitalizing costs associated with the Company's option agreements with land banks in order to give a more favorable near-term impression of performance. ***Second***, Defendants' statements misrepresented the purpose of the Millrose spin-off as a way to create a land bank intended to transition Lennar from a "traditional homebuilder with sizable land assets to being a pure-play land-light asset-light manufacturing

model homebuilder . . . .” In truth, and unbeknownst to investors, the spin-off was at least in part intended to smooth and/or inflate Lennar’s own struggling finances by facilitating Millrose’s purchase of Lennar homes at above market rates to hide the extent of Lennar’s declining demand and financial performance.

## VI. THE TRUTH BEGINS TO LEAK THROUGH A SERIES OF PARTIAL CORRECTIVE DISCLOSURES

29. On December 16, 2025, investors first began to learn the truth about Lennar’s performance and true demand for its products—including important financial metrics like home deliveries and margins—when the Company announced its 2025 fiscal fourth quarter and full year financial results.

30. In a December 16, 2025, press release, Lennar announced that its adjusted per-share earnings came in at $2.03 per share for three months through November, down from $4.03 per share a year earlier ***and missing the Street’s view of $2.26 per share***. In addition, Lennar disclosed a 2026 fiscal first quarter delivery outlook that was below market estimates anticipating delivering between 17,000 and 18,000 homes in the ongoing quarter versus consensus estimates for 19,948 homes.

31. Following the fourth quarter 2025 earnings release and conference call, JPMorgan issued a post-call research report that lowered its fiscal year 2026-2027 estimates and reduced its price target from over $100 per share to $80 per share, maintaining an uncommon “underweight” rating for the stock. In the report, the analyst noted that, “while LEN in 3Q decided to ‘ease back’ its delivery expectations to help establish a ‘floor on margin,’ the company noted today that it is ‘pretty committed to the volume and maintaining the volume.’”

32. While the Company admitted lower than expected deliveries and guided for further reductions going forward, Lennar continued to downplay the full extent of its demand problem

and continued to hide the full scheme to obscure the problem. As part of its fourth quarter and full-year 2025 results, Lennar further announced that it had officially completed the Millrose transaction, having launched and completed the split-off exchange offer to swap its remaining 20% stake in Millrose. In announcing the official completion of the transaction, Lennar continued to hide material negative facts including that the transition to a land-light model was not working, and that Defendants were using Millrose to inflate Lennar's earnings, concealing the full extent of the damage from negative external market conditions.

33. Although the December disclosures addressed in part the Company's declining financial performance, Lennar continued to mislead investors about the extent of the damage. For instance, in its December 16, 2025, press release, Lennar reassured investors that, "[e]ven as market conditions softened, we prioritized providing supply for a healthier housing market, while driving down costs to support affordability. Our strategy remains consistent and clear: maintain volume, adapt to evolving conditions, reduce costs, and support housing affordability." Lennar continued to falsely claim that the Company's asset-light strategy was working as a way to build resilience against negative market forces when in fact Lennar was facilitating Millrose's purchase of Lennar homes at above market rates to hide the extent of Lennar's declining demand and financial performance.

34. In response to these disclosures, Lennar's stock price dropped $5.34 per share, or 4.54%, on December 17, 2025, from $117.57 per share to $112.23 per share on extremely heavy trading volume. The next trading day, Lennar stock dropped an additional $3.90 per share to $108.33 per share, for a total two-day drop of $9.24 per share, or 7.86%, wiping out nearly $2 billion in market capitalization.

35. On March 13, 2026, Lennar announced fiscal first quarter 2026 financial results and held a corresponding conference call the next day. On the call, Miller stated that Lennar's "***land banking relationships with Millrose***" and others "***continue to function extremely well, providing just-in-time homesite delivery in support [of] our manufacturing model***."

36. Then, on March 30, 2026, Lennar issued a seemingly unprompted press release reaffirming the purported benefits of its land-light strategy. The press release alluded to questions from "several analysts and investors for information and explanation of various parts of our land light strategy, as well as our volume-prioritized strategy." Without explaining what exactly those analysts and investors had asked, Lennar said it was "confident in the accuracy of our financial statements and the adequacy of our public disclosures." Lennar added it had had to accept "margin compression" due to rising interest rates and affirmed that it "used incentives and interest rate buydowns as a shock absorber" that reduced margins "in order to meet the market at a price point that working families could afford[.]"

37. Surprised by the tone and content of the statement, investors reacted swiftly and negatively to this press release. For example, according to a *Bloomberg* article published the same day, entitled "Lennar Falls After Statement Defending 'Land-Light' Strategy," a Truist analyst described Lennar's press release as "defensive" and characterized land-banking arrangements as "tend[ing] to have some unique accounting attributes . . . ." In reaction to these new disclosures, the price of Lennar stock fell $5.37 per share—nearly 6%—from a close of $90.25 per share on Friday, March 27, 2026, to a close the next trading day of $84.88 per share on Monday, March 30, 2026. This drop wiped out nearly $1 billion in market capitalization.

38. The next day, on March 31, 2026, reputable short-seller Hunterbrook issued a report (the "March Report") exposing how Lennar was consistently missing its financial expectations, despite

Defendants' claims that its asset-light strategy was working. The March Report revealed that, in truth, the Company's pivot to using land banks had "locked the company into paying Wall Street firms more than $2 billion a year in annual fees just to maintain options on land it used to own." Nevertheless, the fees did not immediately appear in earnings reports because Lennar was secretly capitalizing some of these fees, "recording billions in accumulated spending as though it [was] an asset." Consequently, "the income statement today seemingly reflects only the earlier, smaller vintages of land bank deals," which "enables Lennar to present better earnings today, at the expense of worse [cost of goods sold] tomorrow." An accountant Hunterbrook consulted in the March Report described the strategy as "nuts" and only "delaying the inevitable."

39. In the Company's April 9, 2026, Form 10-Q, and seemingly in response to the March Report, Defendants admitted that "[a]ll deposits and pre-acquisition costs on real estate, including option maintenance fees paid to land banks, are capitalized."

40. Over the next six months, Lennar reported its fiscal second and third quarter 2026 financial results but surprisingly made no mention of Millrose whatsoever. However, in its second quarter 2026 conference call on June 12, 2026, Miller stated, "***our strategy has not changed***" and reiterated its two strategic priorities of "***driving consistent even flow production and volume***" and "***continuously refining our asset-light, land-light balance sheet model to generate strong and growing cash flow and returns***." In its third quarter 2026 earnings call on September 17, 2026, Miller again stated its operating strategy had not changed, and that the Company remained focused on the same two priorities. These statements were false and misleading in failing to disclose (1) that Lennar was secretly capitalizing costs associated with the Company's option agreements with land banks in order to give a more favorable near-term impression of performance, and (2) that the spin-off was at least in part intended to smooth and/or inflate Lennar's own struggling finances by

facilitating Millrose's purchase of Lennar homes at above market rates to hide the extent of Lennar's declining demand and financial performance.

## VII. THE FULL TRUTH IS REVEALED

41. Finally, on October 2, 2026, investors learned the full truth when Hunterbrook issued a second report (the "October Report") which revealed that Lennar was using Millrose to prop up home sales in direct contradiction to its stated business purpose. The October Report stated that "[t]he nation's second-largest homebuilder is struggling to sell houses. So it found a buyer it previously owned: Millrose Properties, which gets most of its revenue from Lennar and counts Lennar's CEO as its largest voting shareholder. Contrary to the plans in its initial SEC filings, Millrose has now bought an estimated $200 million of Lennar homes in about a month and is renting them out at what appears to be a loss."

42. The October Report revealed that Lennar had met quarterly targets only by selling hundreds of finished homes to its own spinoff, Millrose. Indeed, Hunterbrook identified over 700 home purchases by Millrose totaling approximately $200 million across 15 states in roughly a month, with at least 356 of those purchases occurring in the final week of Lennar's fiscal third quarter.

43. In addition, the October Report estimated Millrose's net rental yield at around 5%, failing to cover its borrowing costs of 6.5% to 6.75%. Furthermore, property records indicate Millrose paid roughly 13% more than individual retail buyers after accounting for incentives. With Defendant Miller holding 43% of Millrose's voting power, accounting experts in the October Report questioned whether Millrose is acting against its independent financial interest to bolster Lennar. In other words, Millrose was losing money on these transactions, and they made no economic sense other than to help Lennar.

44. The October Report further noted that Lennar was struggling to sell houses, and that the previously undisclosed arrangement with Millrose "may obfuscate the true lack of demand for

Lennar's homes. For families in these developments, it means more rentals next door and, some homeowners worry, lower resale values."

45. In response to the October Report, Lennar's stock price tumbled nearly 7%, or $5.37 per share, from $79.81 per share on Friday, October 2, 2026, to $74.44 per share on Monday, October 5, 2026, on unusually high trading volume of nearly 10.7 million shares. The sudden drop erased over $1 billion of the Company's market value.

46. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

47. During the Class Period, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public statements and documents they issued or disseminated to the investing public during the Class Period were materially false or misleading. Defendants knowingly and substantially participated in or acquiesced to the issuance or dissemination of such statements and documents in violation of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Lennar's relationship and transactions with Millrose and their control over, receipt, and/or modification of Lennar's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

48. Following the March Report, in Lennar's April 9, 2026, Form 10-Q, Defendants admitted that "[a]ll deposits and pre-acquisition costs on real estate, including option maintenance fees paid to land banks, are capitalized." Defendants thus conceded that they knew they were presenting misleadingly positive earnings to the market throughout the Class Period.

49. Defendants also knew or recklessly disregarded the false and misleading nature of the information concerning the purpose of the Millrose spin-off, Millrose's purported role as an independent land bank, and the impact of Lennar's transactions with Millrose on the Company's reported financial results. In particular, Defendants knew or recklessly disregarded that Millrose was purchasing hundreds of completed homes from Lennar at above-market prices and renting them at a loss, contrary to its stated business objectives, thereby enabling Lennar to bolster its reported sales and financial results while concealing weakening demand for its homes.

50. The circumstances surrounding these transactions further support a strong inference of scienter. As alleged herein, Millrose purchased more than 700 homes from Lennar totaling approximately $200 million across 15 states in roughly one month, including at least 356 purchases during the final week of Lennar's fiscal third quarter. Millrose allegedly paid approximately 13% more than individual retail buyers for these homes, while the estimated rental yields on the properties were insufficient to cover Millrose's borrowing costs. Moreover, Defendant Miller held approximately 43% of Millrose's voting power. The magnitude, timing, and economically unfavorable terms of these transactions, together with Miller's substantial voting interest in Millrose, support an inference that Defendants knew or recklessly disregarded that the transactions were being used to bolster Lennar's financial results rather than further Millrose's stated business objectives.

51. Given their positions as Lennar's CEO and CFO, respectively, the Individual Defendants exercised control over the contents of Lennar's public statements during the Class Period. The Individual Defendants were each provided with, or had access to, the statements alleged herein to be false and misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Indeed, Miller repeatedly

emphasized the importance of Millrose to Lennar's asset-light, land-light strategy, while Bessette specifically represented that Millrose's low-cost structure was benefiting Lennar's margins.

52. Because of their positions, access to material nonpublic information, and involvement in Lennar's financial reporting and public disclosures, the Individual Defendants knew or recklessly disregarded that the adverse facts concerning Lennar's transactions with Millrose had not been disclosed to, and were being concealed from, the investing public. The fraudulent scheme described herein could not have been perpetuated without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

## IX. LOSS CAUSATION

53. During the Class Period, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market. As a result, Plaintiff and the Class purchased Lennar's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## X. CLASS ACTION ALLEGATIONS

54. Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all persons who acquired Lennar securities during the Class Period. Excluded from the Class (an "Excluded Person") are Defendants, the officers and directors of Lennar, the immediate family members of any Excluded Person, the legal representatives, heirs, successors or assigns of any Excluded Person, and any entity in which any Excluded Person has or had a controlling interest.

55. The members of the Class are so numerous that joinder of all members is impracticable. Lennar stock is actively traded on the NYSE, with nearly 208 million shares outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through discovery, there are likely to be thousands of Class members. Record owners and other members of the Class may be identified from records maintained by the Company and/or its transfer agent and may be notified of the pendency of this action by mail or electronic delivery, using a form of notice similar to that customarily used in securities class actions. The disposition of the Class's claims in a class action will therefore provide substantial benefits to the parties and the Court.

56. Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' alleged conduct in violation of the Exchange Act as complained of herein.

57. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.

58. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation may make it impossible for members of the Class to individually seek redress for the wrongs done to them. There will be no difficulty in the management of this action as a class action.

59. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the federal securities laws by their acts and omissions as alleged herein;

(b) whether Defendants made statements to the investing public during the Class Period that contained material misrepresentations or omitted material facts;

(c) whether and to what extent the market price of Lennar's common stock and options were artificially inflated during the Class Period because of the material misstatements and omissions alleged herein;

(d) whether Lennar, Miller, and Bessette acted with the requisite level of scienter;

(e) whether Miller and Bessette violated Section 20(a) of the Exchange Act as controlling persons of Lennar;

(f) whether reliance may be presumed; and

(g) whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of those damages.

## XI. NO SAFE HARBOR

60. The Private Securities Litigation Reform Act's statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements alleged herein.

61. None of the statements complained of herein were forward-looking. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

62. To the extent that any materially false or misleading statement alleged herein, or any portions thereof, may be construed as forward-looking, such statement was a mixed statement

of present and/or historical facts and future intent, and is not entitled to safe harbor protection with respect to the part of the statement that refers to the present and/or past.

63. To the extent that any materially false or misleading statement alleged herein, or any portions thereof, may be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof. As alleged above in detail, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

64. To the extent that any materially false or misleading statement alleged herein, or any portion thereof, may be construed as forward-looking, Defendants are liable for any such false or misleading statement because at the time such statement was made, the speaker actually knew the statement was false or misleading, or the statement was authorized and approved by an executive officer of Lennar who knew that such statement was false or misleading.

## XII. PRESUMPTION OF RELIANCE

65. At all relevant times, the market for Lennar common stock was efficient for the following reasons, among others:

(a) Lennar common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, national stock market;

(b) As a regulated issuer, Lennar filed periodic public reports with the SEC;

(c) Lennar regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of investor releases on the major news wire services and through other wide-ranging public disclosures, such as

communications with the financial press, securities analysts, and other similar reporting services; and

(d) Lennar was followed by multiple securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and/or reported on and entered the public marketplace.

66. As a result of the foregoing, the market for Lennar securities promptly digested current information regarding Lennar from all publicly available sources and reflected such information in the price of Lennar common stock. Under these circumstances, all purchasers of Lennar securities during the Class Period suffered similar injury through their purchase of Lennar securities at artificially inflated prices and a presumption of reliance applies.

67. Further, at all relevant times, Plaintiff and other members of the Class reasonably relied on Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiff and other members of the Class would not have purchased or otherwise acquired Lennar common stock at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiff and other members of the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).

## XIII. CAUSES OF ACTION

### COUNT I

### Against All Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5

68. Plaintiff repeats, incorporates, and realleges every allegation set forth above as if fully set forth herein.

69. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other members of the Class, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Lennar securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

70. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Lennar securities in an effort to maintain artificially high market prices in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein and/or as controlling persons, as alleged below.

71. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Lennar's business operations and financial position, as alleged herein.

72. Defendants employed devices, schemes, and artifices to defraud, while in possession of material, adverse non-public information and engaged in acts, practices, and a course of conduct as

alleged herein in an effort to assure investors of Lennar's value and performance, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company's business metrics and financial position in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Lennar securities during the Class Period.

73. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their respective purchases and sales of Lennar securities during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Lennar securities and experienced loses when the artificial inflation was released from the price of Lennar securities as a result of the partial revelations and price declines detailed herein. Plaintiff and the Class would not have purchased Lennar securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

74. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

75. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their acquisitions of Lennar securities during the Class Period.

## COUNT II

### Against the Individual Defendants for Control Person Liability Under Section 20(a) of the Exchange Act

76. Plaintiff repeats, incorporates, and realleges every allegation set forth above as if fully alleged herein.

77. The Individual Defendants each acted as a controlling person of Lennar within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions as the two highest-ranking executive officers and their participation in and/or awareness of the true state of the Company's business metrics and financial position, the Individual Defendants each had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the press releases concerning the Company's business metrics and financial position.

78. As set forth above, Lennar and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are each liable pursuant to Section 20(a) of the Exchange Act.

79. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their acquisitions of Lennar securities during the Class Period.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment:

A. Determining that the action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

E. Awarding such other and further relief as the Court may deem just and proper.

## XV. JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: November 11, 2026

**JOSHUA E. DUBIN, ESQ., P.A.**

By: */s/ Joshua E. Dubin*
Joshua E. Dubin (FL Bar #48865)
201 South Biscayne Boulevard, Suite 1300
Miami, FL 33131-4311
Tel: 917-523-0124
josh@jdubinlaw.com

**GRANT & EISENHOFER P.A.**
Karin Fisch (*pro hac vice* forthcoming)
Vincent J. Pontrello (*pro hac vice* forthcoming)
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel: 646-722-8500
kfisch@gelaw.com
vpontrello@gelaw.com

*Counsel for Plaintiff*